STEPHEN KERSTEN, by JACOB KERSTEN, His Next Friend, Appellant, v. WALKER D. HINES, Director General of Railroads Under United States Railroad Administration.

In Banc, July 12, 1920.

1. **REASONS FOR NEW TRIAL.** The memorandum opinion filed by the trial judge throws light on the reasons expressed in the order granting a new trial.

2. **NEW TRIAL: Remarks of Counsel: Reference to Inadmissible Evidence.** A statement questioning the signature to a paper which was not admissible in evidence and whose admission over proper objection would have been reversible error, made by counsel before he withdrew his objection to its admission, is not a ground for granting a new trial to the opposite party.

3. ———: ———: **Not Assigned by Trial Court: Burden: Presumption.** In an appeal from an order granting a new trial the burden is upon appellant to show that the ground upon which the court put the order does not support it; and as to other remarks of ap-

pellant's counsel charged in the motion to have been prejudicial, but not assigned by the trial court as a ground for granting a new trial, the presumption will be indulged on appeal that the ruling was right until respondent shows to the contrary.

4. ——: ——: ——: Discretion: No Exceptions. With respect to argument of counsel to the jury the trial court is vested with a discretion which will not be overruled unless it is shown to have been arbitrarily exercised; and where the trial court almost invariably ruled with respondent upon the remarks complained of and counsel saved no exceptions to the court's ruling or lack of ruling in connection therewith, it cannot be ruled on appeal that such other remarks, not assigned by the trial court as a ground for the new trial in its order granting the same, justify the order.

5. **ACTION AGAINST RAILROADS: Substitution of Director General.** Under the circumstances of this case, which was originally brought in May, 1918, for an injury received in February, 1918, against two railroad companies, the trial court did not err in permitting the substitution of "Walker D. Hines, Director General of Railroads," as the defendant, nor did it err in refusing to substitute "Walker D. Hines, Director General of Railroads in charge of the Missouri Pacific Railroad Company" for "Walker D. Hines, Director General of Railroads," nor did it err in refusing to instruct that in the absence of proof that the train which injured plaintiff was one of the Missouri Pacific Railroad Company the verdict must be for defendant.

6 ——: ——: Judicial Notice. The Supreme Court takes judicial notice that prior to February 1, 1918, the Director General assumed control of the properties of railroad companies in this State.

7 ——: ——: Acquiescence of Defendant: Legality of Order No. 50. It is not necessary to determine whether under Order No. 50, issued by the Director General on October 28, 1918, the Director General of Railroads could be legally substituted as a defendant, against the protest of a plaintiff, in lieu of a railroad company on whose line the personal injury occurred, where at the trial plaintiff consented to the substitution, it was suggested by the Director General, he saved no exceptions to it, but amended his answer to conform to it, and suggested and secured a stipulation that any judgment which might be rendered should be rendered against him as Director General of Railroads "and not otherwise;" for under such circumstances, he is in no position to question the legality of Order No. 50, which expressly provides that such actions shall be brought against the Director General of Railroads "and not otherwise."

8. ————: Judgment Against Director General: Substitution of Agent. Section 206 of the Act of Congress of February 28, 1920, authorized the appointment of an "agent" in lieu of the Director General of Railroads and expressly provided that pending actions should not abate by reason of the termination of Federal control, "but may be prosecuted to final judgment, substituting the agent designated by the President under subdivision (a)," *Held*, in a case tried in February, 1919, and heard on appeal at the April Term, 1920, that plaintiff's motion to substitute, as defendant, "Walker D. Hines, the Designated Agent Under Subdivision (a) of Section 206 of the Transportation Act of 1920" for "Walker D. Hines, Director General of Railroads under the United States Railroad Administration," should be sustained.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm*, Judge.

REVERSED AND REMANDED (*with directions*).

*Sidney T. Able* and *Charles P. Noell* for appellant.

(1) The trial court erred in setting aside the verdict of the jury and granting the respondent a new trial herein. A party offering in evidence what it claims is a memorandum in the handwriting of a witness without first having given the witness an opportunity to explain the memorandum or to testify as to its genuineness is not entitled to have such claimed memorandum go before the jury. Such party cannot complain if the opposing party offers to withdraw his objections to such evidence if such party fulfills some condition required by the opposing party (in this case the submission of the paper to some handwriting expert), and where the opposing party finally withdraws objection to the paper and permits it to go in evidence, such party cannot close the mouth of the opposing party and thereby require him to admit the genuineness of a written memorandum when such opposing party has access to other evidence in the case which contains the handwriting of the same witness (in this case the signature of Officer Coyle appears on the deposition in file·in the case). Such opposing party

283 Mo.—40

would undoubtedly have the right to have compared such writings, that is, the claimed handwriting of Coyle on the memorandum claimed to have been made by him with his known genuine signature which appeared on the deposition. Harrison v. Lakeman, 189 Mo. 581, 607. (2) After making a formal stipulation in open court the respondent cannot on appeal complain of the action of the trial court for thereafter during such trial ruling in accordance with this stipulation. State v. Keithley, 204 S. W. (Mo.) 24; Pratt v. Conway, 148 Mo. 291; Moling v. Barnard, 65 Mo. App. 600; Mitchell v. Brown, 190 S. W. 354. (3) Respondent cannot preserve for review abandoned pleadings. (4) Respondent cannot be heard to say that he is not in court, or that the court erred in ruling in such a way as to allow any judgment rendered for plaintiff to go against him, after coming into court at his own instance after filing an answer to the merits and after having stipulated that the judgment, if any, for plaintiff should be against him. Kepley v. Railroad, 200 S. W. 756; Newcomb v. Railroad, 182 Mo. 707; Thomasson v. Ins. Co., 217 Mo. 485.

*James F. Green* and *H. H. Larimore* for respondent.

(1) The trial court was in error in permitting the plaintiff, after he had alleged in his petition that the cause of action accrued by reason of the operation of the Missouri Pacific Railroad by Walker D. Hines, Director General, had introduced testimony in support of such allegation and closed his case upon that theory, to amend his petition by striking out all reference to the Missouri Pacific Railroad or any other railroad, and go to the jury upon the bare allegation that the train in question was being operated by the Director General. Sec. 10, Act of Congress of March 21, 1918; Rutherford v. Railroad, 254 Fed. 880; Dodson v. Scroggs, 47 Mo. 285; Headlee v. Cloud, 51 Mo. 301; Winslow v. O'Pry, 56 Ga. 138; Watson v. Collins, 37 Ala. 587; Daniel v. Hollingshead, 16 Ga. 190; Hamilton v. Ewing, 6 Blackf. 88; 39 Cyc. 653.

Kersten v. Hines.

(2) Also the action of the court in permitting the plaintiff after his case was closed, to make the amendment above referred to resulted in a situation where the plaintiff sued upon one alleged cause of action, introduced testimony in support thereof and then went to the jury upon another and entirely different cause of action; because of this the motion for new trial should have been sustained. Peters v. Carroll, 153 Mo. App. 375; Waldhier v. Railroad, 71 Mo. 514; Henry County v. Citizens' Bank, 208 Mo. 209; Chitty v. Ry., 148 Mo. 64; Jordan v. Railroad, 105 Mo. App. 446. (3) The conduct of counsel for plaintiff, both at the time the statement of Coyle was introduced in evidence with the consent of such counsel and in his closing argument wherein he continuously misstated the law and the facts with reference to such statement, was such as to justify, and in fact compel the court in the interest of justice, to grant to defendant a new trial. Third Ave. Ry. Co. v. Mills, 249 Fed. 661; Jackman v. Ry. Co., 206 S. W. 244. (4) Motion for new trial because of misconduct of counsel in the presence of the jury is addressed largely to the judicial discretion of the court. State ex rel. v. Ellison, 256 Mo. 662; Stetzler v. Met. St. Ry. Co., 210 Mo. 704; Warnke v. Rope Co., 178 S. W. 76.

BLAIR, J.—This is an appeal from an order granting a new trial in an action for injuries to Stephen Kersten, a minor. The injury occurred February 1, 1918, and the action was begun May 17, 1918. The trial occurred in 1919. The boy lost both legs and was otherwise injured. The motion for new trial was sustained on the ground that certain remarks of counsel during the trial constituted error. The facts in connection with the several questions discussed are subsequently stated.

I. The motion for new trial was sustained "because of the action of counsel for plaintiff in making state-

Remarks of Counsel.

ments on the trial in the presence and hearing of the jury intimating emphatically that the report made by Officer Coyle, introduced in evidence, and the signature thereof were not genuine."

In order that this ruling may be understood it is necessary to set out the facts which gave rise to it. Coyle's deposition had been taken by respondent on August 10, 1918, at the Marine Barracks, near Paoli, Pennsylvania. In that deposition Coyle testified that on February 1, 1918, the date appellant was injured, he was a member of the St. Louis Police Force, assigned to the Fifth District; that about 4:30 p. m. on February 1, 1918, he arrived with the ambulance at the watchman's shanty at the corner of Main and Brooklyn streets in St. Louis and there saw appellant for the first time; that he placed appellant in the ambulance and conveyed him to the city hospital. "Q. Did he make any statement while in the ambulance or at the hospital? A. He did not, for his head had been crushed, his ankle was crushed also and he was suffering from numerous bruises and abrasions of the head and body. Q. What was his condition with respect to consciousness? A. Unconscious." Coyle testified his duty was to secure all the witnesses possible; that he attempted to do so, but was unable to find anyone who had seen the accident; that he had no personal knowledge; was at the police station when the accident occurred. "Q. Did the boy at any time make any statement? A. No, he made no statement whatever. Q. Mr. Coyle, you made a complete report to your captain? A. I did; which was copied by the clerk at the Fifth District Police Station, which is on record at that station. This report consists of a statement of facts in a general way. Q. This report is on file at Fifth District, is it? A. It should be· on file. Q. Does this report set out correctly what you know about the case? (Objected to by appellant's counsel.) A. To the best of my knowledge and belief it does."

On cross-examination Mr. Coyle said the report was made out by the police clerk at the station from notes made by him—Coyle. On the trial this deposition was offered and read in evidence by appellant's counsel.

Respondent's counsel called a police officer to prove

the signature of Coyle to a written statement respondent desired to put in evidence. The following then occurred:

"Q.   I will ask you to look at that paper that I hand you and examine it and let me know in whose handwriting it is and whose signature it is on there. (Handing paper to witness:)

"MR. ABLE: I wish to object to that, as I don't see how it is relevant in this case in any way, as to whether that is Mr. Coyle's signature on there. An affidavit has been filed as to what Mr. Coyle would say if he were here, which the defendants no doubt will read, and this deposition has been taken. He is not here to say whether that is his handwriting or not, and we do not know whether it is his handwriting or not, and I can't see how that could be material in this case.

"MR. HEZEL: They read the deposition this morning of officer Coyle, in which he said this boy hadn't said anything, and we have a right to impeach that testimony in any proper manner, irrespective of the affidavit, I mean, and the statement that it was conceded yesterday he would make if he was here.

"THE COURT: You read it.

MR. ABLE: I did, but Mr. Coyle should be faced with that very report and asked. That deposition was taken by these defendants. If they wanted to question him about it, why come up here when he has no chance and we haven't any chance to question Mr. Coyle about a paper we don't know anything about, and offer it in evidence in this way?

"MR. HEZEL: The statement says he made a report; his deposition shows it.

"THE COURT: The officer may testify to the signature and I will pass on the competency when it is offered.

"To which action and ruling of the court plaintiff by his counsel then and there duly excepted and still excepts.

"A.   This is officer John Francis Coyle's signature.

"MR. HEZEL: Q.   All in his handwriting? A.   Yes, sir.   I assigned him to this case myself.

"Q. Where has this paper been since? A. Filed in our record room.

"Q. In your record room at the Fifth District? A. Yes, sir.

"Q. And did you get it from there? A. Yes, sir.

"MR. HEZEL: Please mark that Defendant's Exhibit F. (Said paper was marked for identification Def. Ex. F).

"THE COURT: You will have to make this statement competent.

"MR. ABLE: I am willing to select any handwriting expert and if they say these signatures are the same I will admit it without objection. I think there is a Mr. Mechin that makes a specialty of that work, and if he will say so I will pay half the expense on it and admit it—Gus V. H. Mechin. I will pay half the expense on it.

"MR. LARIMORE: I object to those remarks.

"THE COURT: That sort of talk don't help the court any.

"MR. HEZEL: That matter is a matter of public record. Anybody could see that. I know we saw it.

"THE COURT: Have you laid any proper foundation for this?

"MR. HEZEL: The question was asked this man Coyle whether or not this boy said anything with reference to how he was injured and he said he didn't, because he was unconscious. This is their witness, so we took his deposition at that time. Now I want to prove that he has made a report in writing that the boy did tell him how this accident happened.

"THE COURT: Before you could do that, wouldn't it be necessary to ask him if he did make a report in writing, in which he stated thus and so?

"MR. HEZEL: Not when he denies the boy says anything.

"THE COURT: He doesn't. First he denies, and then says, 'If my report says so, he did say something.'

"MR. HEZEL: Then we have a right to show what his report is. We have a right to contradict his statement

Kersten v. Hines.

by showing he made contrary statements, where the question was as broad as it was and the answer was as it was. If I say, 'Did you ever tell anybody this?' and he says no, I don't have to ask him, 'Did you tell Judge Grimm?'

"THE COURT: But when you ask him did he make his statement in writing to police headquarters and he says, 'Yes, I did,' and he also says, 'I may have said something about the boy in that,' and you don't then ask him the question, for laying the proper foundation, didn't you ask him that question so he could explain it correctly? That is entirely aside from the question. At the time he was testifying he was your witness, and not their witness. You must look at the situation as it existed at that time.

"MR. HEZEL: Here is what we are contradicting—

"MR. ABLE: We are going to withdraw our objection, your Honor, and let him read it. It will save us all time.

"THE COURT: That simplifies matters some. He withdraws the objection and you may read it.

"MR. HEZEL: I offer it now and read it in evidence.

"(Said paper, Defendant's Exhibit F, offered and read in evidence, is in words and figures as follows:)

"Feb. 1, 1918.

"Serg't. Woodling,
  "Sir:
  "About 4:35 p. m. this date, Mo. Pac. R. R. Co's engine No. 481, in charge of Engineer Theodore Sharleville, 3529 Caroline St., Fireman David Lynch, 3001 Chouteau Ave., Conductor Thomas Hubbard, 3826 Shenandoah Ave., and switchmen Arthur Mathews, 3418 Park Ave., Chas. A. Hughes, 2217 Gratiot St., and Ben C. Miller, 2217 Gratiot St., was moving a number of freight cars north over T. R. R. Ass'n tracks on Main St., when at the intersection of Main and Brooklyn Sts., one Steve Kersten, 13 years old, born in Mo., school-boy, residing with his parents, Jacob and Veronica Kersten, at 717-A Mound St., attempted to board one of the moving cars, and fell beneath the train, one car passing over his lower limbs, and throwing him to west side of track. The boy stated that he had been playing on approach to Mound St. viaduct at this point, and was attempting to steal a ride on said train when injured.

  "City ambulance was called from this station and conveyed Kersten via, Central Dispensary to City Hospital where Dr. Vin-

cent Townsend pronounced him suffering from lacerations of left leg and scalp, abrasions of face and traumatic amputation of right foot, very serious. His parents know of his whereabouts, and are to be notified of further developments.
Witnesses:

"Jennie Pawloski, 13, 823 Brooklyn St.
Annie Siminski, 12, 717 Mound St.

"Respectfully,
"JOHN F. COYLE, Prob. P."

"MR. HEZEL: That is all.

"MR. ABLE: That is all.

"MR. HEZEL: We now offer this testimony that it was conceded that John Francis Coyle would give if he were present at this trial.

"(Said offer of testimony is in words and figures as follows:)

"About 4:35 p. m. this date, Missouri Pacific Railroad's engine No. 481, in charge of Engineer Theodore Sharleville of 3529 Caroline Street, fireman David Lynch of 3001 Chouteau Avenue, conductor Thos. Hubbard, of 3826 Shenandoah Avenue, and switchmen Arthur Mathews of 3418 Park Avenue, Charles A. Hughes of 2217 Gratiot Street and Ben C. Miller of 2217 Gratiot Street, was moving a number of freight cars over Terminal Railroad Association tracks on Main Street, when at the intersection of Main and Brooklyn Streets one Steve Kersten, at 716A Mound Street, attempted to board one of the moving cars and fell beneath the train, one of the cars passing over his lower limbs and throwing him to west side of track.

"The boy stated that he had been playing on approach to Mound Street viaduct at this point and was attempting to steal a ride on said train when injured.

"A city ambulance was called and he was conveyed via Central Dispensary to City Hospital, where Dr. Vincent Townsend pronounced him suffering from lacerations of left leg and scalp, abrasions of face and traumatic amputation of right foot, very serious.

"His parents know of his whereabouts and are to be notified of further developments."

It was on account of the objections and remarks of counsel for appellant as above set forth that the court granted a new trial. This appears from the language of

the order and is confirmed by a memorandum filed by the court which throws "light upon the view the circuit court took of" the matter. [Hays v. Hogan, 273 Mo. l. c. 11.] It will be observed that what the court deemed objectionable had already occurred when appellant's objection was withdrawn and the statement admitted in evidence. The statement was offered to contradict and impeach Coyle whose deposition had been offered. He had not been examined concerning it. It had not been called to his attention. He had been afforded no opportunity to explain such contradictions as appear or seem to appear between it and his deposition or to deny its authenticity. It was clearly inadmissible, had appellant not withdrawn his objection. [Gregory v. Cheatham, 36 Mo. 155; State v. Grant, 79 Mo. l. c. 132; State v. Devlin, 7 Mo. App. l. c. 36; Ely Walker Dry Goods Co. v. Mansur, 87 Mo. App. l. c. 113; Ayers v. Watson, 132 U. S. l. c. 404, 405.] These and other decisions show respondent could not have secured the admission of the paper as a matter of right. To have admitted it over a proper objection would have constituted reversible error. It was, in fact, admitted by grace of the withdrawal of the objection. Had the objection been insisted upon, the statement could not have been admitted at all. It made no difference what counsel said about the paper before he withdrew his objection. Respondent could not complain thereof since the paper was not admissible under the rules of evidence. When the objection was withdrawn and the paper admitted, respondent thereby secured more than he was entitled to claim as a legal right. He cannot complain that he was not permitted to secure still more, the law being that he was entitled to nothing, under the rules of evidence. The reason the court gave for sustaining the motion for new trial is unsound.

II. Respondent brings forward certain remarks of appellant's counsel made during the argument, and insists that these justified the order granting a new trial.

**Other Remarks.** In an appeal from such an order the burden is upon the appellant to show that the ground upon which the court put the order does not support it; and "as to the other grounds of the motion, the presumption will be indulged that the court's ruling was right until the *respondent* shows the contrary." [State ex rel. v. Thomas, 245 Mo. 1. c. 73, 74.] The effect of the order was to overrule all other grounds except that therein specified. It is settled law that with respect to argument of counsel, the trial court is vested with a discretion which will not be overruled unless it is shown to have been arbitrarily exercised. As to the matter now complained of, the court almost invariably ruled with respondent upon his objections, and counsel for respondent were well enough satisfied therewith that they saved no exception to any ruling or lack of ruling in that connection. In the circumstances we cannot hold that the trial court was wrong in overruling the ground of the motion for new trial pertaining to what occurred during the argument.

III. The injury for which damages are asked occurred February 1, 1918. The action was commenced May 17, 1918. While the record proper does not show it, it is inferable from the record that the action was begun against the Missouri Pacific Railroad Company and the Terminal Railroad Association of St. Louis.

**Substitution of Director General As Defendant.** No answer was filed by either of these companies, but Walker D. Hines, who described himself as Director General of Railroads in charge of the two companies named, filed his answer. At the beginning of the trial in February, 1919, at the suggestion of counsel for the Director General, acquiesced in by appellant, the petition was amended to show that the action was against Walker D. Hines as Director of Railroads, operating the Missouri Pacific Railroad Company, and Walker D. Hines, as Director General of Railroads, operating the Terminal Railroad Association of St. Louis. The trial proceeded,

and it seemed to develop that the Terminal Railroad Association's property was not connected with the movement which caused the injury, and an instruction was given to the effect that plaintiff was "not entitled to recover against the defendant Walker D. Hines, Director General of Railroads, operating the Terminal Railroad Association of St. Louis." The court refused a like instruction as to "Walker D. Hines, Director General of Railroads, operating the Missouri Pacific Railroad Company." Thereupon, "Walker D. Hines, Director General of Railroads" offered evidence tending to sustain 'the issues upon his part. Some of this evidence was intended to show that the train which caused the injury was operated by employees of the Director General in charge of the St. Louis Merchants' Bridge Terminal Railway. There was evidence to the contrary. It was shown that the Director General was in charge of and operating all three of the roads on February 1, 1918, and that this was still the condition at the time of the trial. The court thereafter refused both respondent's and appellant's further offers of proof on the question whether the train which caused the injury was a Missouri Pacific train, and both the court and counsel for appellant accepted the suggestions of counsel for *respondent* that he be permitted to "take the petition and strike out all but 'Director General of Railroads' " i. e. to strike out the words "in charge of the Missouri Pacific Railroad Company." The caption was so amended and in the body of the petition such changes were made as to charge that the Director General was in "charge of the *property* of the Missouri Pacific Railroad Company" instead of "in charge of the Missouri Pacific Railroad Company."

The court then excluded all testimony upon the question whether the train was in charge of persons operating, under the Director General, a particular railroad; on the ground that the evidence conclusively showed that it was being operated by the Director General and that it was immaterial on what particular tracks it was being operated. To this ruling appellant's counsel excepted,

and respondent's counsel did not. This followed a colloquy between counsel in which the following occurred:

RESPONDENT'S COUNSEL: "To make my meaning clear, lets have this stipulation in the record; that if there is any judgment rendered for plaintiff, the same shall be rendered as against Walker D. Hines, Director General only, and not as Director General of any particular railroad company."

APPELLANT'S COUNSEL: "That is agreeable to me, that the judgment read simply against Walker D. Hines, Director General of Railroads."

RESPONDENT'S COUNSEL: "And not as Director General of any particular railroad."

APPELLANT'S COUNSEL: "That is agreeable to me and that is the way I understand the order that was issued from Washington."

Following this and the exclusion of the testimony mentioned, counsel for respondent refiled his answer, in which he describes himself solely as "Walker D. Hines, Director General of Railroads." This consisted of (1) a general denial; (2) an admission that respondent was the duly appointed Director General of Railroads; and (3) a plea of contributory negligence.

It is argued that the court erred in permitting the amendments which resulted in substituting Walker D. Hines, Director General of Railroads, for Walker D. Hines, Director General of Railroads in charge of the Missouri Pacific Railroad Company. The position of counsel is that the action should have proceeded against the Director General "in charge of the Missouri Pacific Railroad Company;" and in the absence of proof that the train was one of the Missouri Pacific Railroad Company, an instruction to find for respondent should have been given. The trial court did not sustain the motion for a new trial on this ground. We do not think the Director General is in a position to raise the question.

August 29, 1916, in "an act making appropriations for the support of the army for the fiscal year ending June 30, 1917" was enacted the following:

"The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful and desirable." [Sec. 1, Chap. 418, 39 Gen. Stats. 645; U. S. Comp. Stats. 1918, sec. 1974a.]

War was declared in April, 1917, and on December 26, 1917, the President, in the exercise of the powers vested in him by the quoted section, issued the following proclamation:

"It is hereby directed that the possession, control, operation, and utilization of such transportation systems hereby by me undertaken shall be exercised by and through William G. McAdoo, who is hereby appointed and designated Director General of Railroads. Said director may perform the duties imposed upon him, so long and to such extent as he shall determine, through the boards of directors, receivers, officers and employees of said systems of transportation. Until and except so far as said director shall from time to time by general or special orders otherwise provide, the boards of directors, receivers, officers, and employees of the various transportation systems shall continue the operation thereof in the usual and ordinary course of the business of common carriers, in the names of their respective companies.

"Until and except so far as said director shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission and to all statutes and orders of regulating commissions of the various states

in which said systems or any part thereof may be situated. But any orders, general or special, hereafter made by said director, shall have paramount authority and be obeyed as such. . . .

"Except with the prior written assent of said director, no attachment by *mesne* process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments rendered as hitherto until and except so far as said director may, by general or special orders, otherwise determine."

Thereafter, on March 21, 1918, Congress passed an act (C. 25, secs. 8, 9 and 10, 40 Stat. at Large; U. S. Comp. Stats. 1918, secs. 3115-3/4h, and 3115-3/4i and 3115-3/4j) which contains the following:

"The President may execute any of the powers herein and heretofore granted him with relation to Federal control through such agencies as he may determine, and may fix the reasonable compensation for the performance of services in connection therewith, and may avail himself of the advice, assistance, and cooperation of the Interstate Commerce Commission and of the members and employees thereof, and may also call upon any department, commission, or board of the Government for such services as he may deem expedient. But no such official or employee of the United States shall receive any additional compensation for such services except as now permitted by law.

"Sec. 3115-3/4i. Act Aug. 29, 1916, c. 418, to remain in force; further powers of President—The provisions of the act entitled 'An Act making appropriations for the support of the Army for the fiscal year ending June thirteenth, nineteen hundred and seventeen, and for other purposes,' approved August twenty-ninth, nineteen hundred and sixteen, shall remain in force and effect except as expressly modified and restricted by this act; and the President, in addition to the powers conferred by this act, shall have and is hereby given such

other and further powers necessary or appropriate to give effect to the powers herein and heretofore conferred. The provisions of this act shall also apply to any carriers to which Federal control may be hereafter extended.

"Sec. 3115-3/4j. Liabilities of carriers; actions by and against. Carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government. Nor shall any such carrier be entitled to have transferred to a Federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the Federal control of such carrier; and any action which has heretofore been so transferred because of such Federal control or of any act of Congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control.

"During the period of Federal control whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the commission pending final determination."

On March 29, 1918, the President issued his proclamation, the pertinent part of which is as follows:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers and authorities so vested in me by said act and of all other powers me hereto enabling, do hereby authorize the said William G. McAdoo, Director General of Railroads, as aforesaid, either personally or through such divisions, agencies, or persons as he may appoint, and in his own name or in the name of such divisions, agencies, or persons, or in the name of the President . . . to make any and all contracts, agreements, or obligations necessary or expedient and to issue any and all orders which may in any way be found necessary and expedient in connection with the federal control of systems of transportation, railroads, and inland waterways as fully in all respects as the President is authorized to do, and generally to do and perform all and singular all acts and things and to exercise all and singular the powers and duties which in and by the said act, or any other act in relation to the subject hereof, the President is authorized to do and perform." [U. S. Comp. St., sec. 3115-3/4h, note.]

"Except with the prior written assent of said director, no attachment by *mesne* process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers."

On April 11, 1918, a second proclamation of the President was issued, which includes the following:

"It is hereby directed that the possession, control, operation and utilization of such transportation systems hereby by me undertaken, shall be exercised by and through William G. McAdoo, who is hereby appointed and designated Director General of Railroads. Said director may perform the duties imposed upon him so long and to such extent as he shall determine, through the boards of directors, . . . officers, and employees of said systems of transportation. Until and except so far as said director shall from time to time by general or special orders otherwise provide, the boards of di-

rectors . . . officers and employees of said trans-
portation systems shall continue the operation thereof
in the usual and ordinary course of the business of com-
mon carriers in the names of their respective companies.

"Until and except so far as said Director General
shall from time to time otherwise by general or special
orders determine, such systems of transportation shall
remain subject to all existing statutes of the United
States and orders of the Interstate Commerce Commis-
sion, and to all statutes and orders of regulating com-
missions of the various states in which said systems or
any part thereof may be situated. But any orders, gen-
eral or special, hereafter made by said Director General,
shall have paramount authority and be obeyed as such."

On October 28, 1918, the then Director General of
Railroads issued Order No. 50, as follows:

"Whereas by the proclamations dated December 26,
1917, and April 11, 1918, the President took possession
and assumed control of systems of transportation and
the appurtenances thereof and appointed the under-
signed, William G. McAdoo, Director General of Rail-
roads, and provided in and by said proclamations that
until and except so far as said director shall from time
to time otherwise by general or special orders deter-
mine, such systems of transportation shall remain sub-
ject to all existing statutes and orders of the Interstate
Commerce Commission and to all statutes . . . but
any orders, general or special, hereafter made by said
director shall have paramount authority and be obeyed
as such; and

"Whereas the act of Congress, called the Federal
Control Act, approved March 21, 1918 (sec. 10, U. S.
Comp. St. 1918, sec. 3115-3/4j), provided that carriers
while under Federal control shall be subject to all laws
and liabilities as common carriers, whether arising un-
der State or Federal laws or at common law, except in
so far as may be inconsistent with the provisions of this
act or any other act applicable to such federal control
or with any order of the President; and

283 Mo.—41

"Whereas since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during Federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits and proceedings hereinafter referred to, based on causes of action arising during or out of Federal control should be brought directly against the said Director General of Railroads and not against said corporations:

"It is therefore ordered, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit, or proceeding but for Federal control might have been brought against the carrier company, shall be brought against the Director General of Railroads, and not otherwise; provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures.

"Subject to the provisions of General Orders numbered 18, 18A and 26 heretofore issued by the Director General of Railroads, service of process in any such action, suit or proceeding may be made upon operating officials operating for the Director General of Railroads, the railroad or other carrier in respect of which the cause of action arises in the same way as service was heretofore made upon like operating officials for such railroad or other carrier company.

"The pleadings in all such actions at law, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad or other car-

rier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom.

"The undersigned Director General of Railroads is acting herein by authority of the President for and on behalf of the United States of America; therefore no *supersedeas* bond or other security shall be required of the Director General of Railroads in any court for the taking of or in connection with an appeal, writ of error, *supersedeas*, or other process in law, equity, or in admiralty, as a condition precedent to the prosecution of any such appeal, writ of error, *supersedeas*, or other process, or otherwise in respect of any such cause of action or proceeding."

On January 11, 1919, this order was amended so as to substitute the name of Walker D. Hines for that of William G. McAdoo.

We take judicial notice that prior to the date of the injury in this case the Director General assumed control of the properties referred to in the pleadings and evidence. [Hanks v. Hines, 219 S. W. 1. c. 979.]

It is not necessary in this case to enter into the controversy over the question whether Order No. 50, as against an objecting plaintiff, legally justifies the substitution of the Director General of Railroads as defendant in lieu of the railroad company on whose line an injury has occurred. Appellant consented to the substitution and in this court maintains it was the legally correct course. Respondent seems to have suggested the substitution. He saved no exceptions to it, but amended his answer to conform to it and suggested and secured a stipulation that any judgment which might be rendered should be rendered against him as Director General of Railroads "and not otherwise." He amended his answer to conform to this view, refiled it, and proceeded to judgment. He filed no affidavit of surprise. In fact, the record discloses that there was nothing done in this connection which did not receive respondent's express or

implied consent. The President's proclamation reserved to the Director General the right to change by orders, such as Order No. 50, the manner of suing in cases such as this. Order No. 50 expressly provides that such actions shall be brought against the Director of Railroads, "and not otherwise." The Director appeared and secured or consented to changes which conformed the pleadings to the order and stipulated for judgment in accordance therewith, if judgment went for appellant. He is in no position to question the legality of Order No. 50. In such circumstances we think the trial court was right in overruling these grounds of the motion for new trial, and that the order granting the motion on another ground cannot now be sustained because of these which the court overruled.

We are also of the opinion that the analogy between the official position of the Director General and administrators and receivers is not such as to render the cases cited applicable in this case. A receiver represents stockholders and creditors. An administrator represents his intestate. Each has charge of an estate as the successor and representative of his predecessor in title and control. The position of the Director General is to be viewed in another light. The Supreme Court (Northern Pacific Railway Company v. North Dakota, 250 U. S. l. c. 148) has pointed out the completeness of the control of the Director General and the entire exclusion of the private ownership theretofore existing.

"No elaboration could make clearer than do the Act of Congress of 1916, the proclamation of the President exerting the powers given, and the Act of 1918 dealing with the situation created by the exercise of such authority, that no divided but a complete possession and control were given the United States for all purposes as to the railroads in question. But if it be conceded that despite the absolute clarity of the provisions concerning the control given the United States, and the all-embracing scope of that control, there is room for some doubt, the consideration of the general context completely dispels

hesitancy. How can any other conclusion be reached if consideration be given the comprehensive provisions concerning the administration by the United States of the property which it was authorized to take, the financial obligations under which it came and all the other duties and exactions which the act imposed, contemplating one control, one administration, one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace for the period provided the private ownership theretofore existing.''

In any event, the course of the Director General at the trial precludes him (and his successors) from maintaining the position now assumed.

IV.   Appellant has filed a motion to substitute, as respondent, ''Walker D. Hines, the Designated Agent Under Subdivision (a) of Section 206 of the Transportation Act of 1920,'' for ''Walker D. Hines, Director General of Railroads Under the United States Railroad Administration.''   Section 206 of the Act of February 28, 1920, authorized the appointment of an ''Agent'' in lieu of the ''Director General.''   Mr. Hines was appointed to the position.   The act expressly provides that actions pending shall not abate by reason of the termination of Federal control, ''but may be prosecuted to final judgment, substituting the agent designated by the President under subdivision (a).''   Respondent's objections to the motion are the same as those already discussed in Paragraph III, supra.   The motion is sustained and the substitution prayed is made.

The order granting the new trial is reversed and the cause is remanded with directions to reinstate the verdict and enter judgment thereon against the substituted defendant.   All concur except *Woodson, J.*, absent.